TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-97-00469-CV







Liberty Finance, Inc., Appellant




v.




Arlene Kreitz Hengst and L & A Properties Limited Partnership, Appellees







FROM THE DISTRICT COURT OF BEXAR COUNTY, 225TH JUDICIAL DISTRICT


NO. 95-CI-13298, HONORABLE JOHN J. SPECIA, JR., JUDGE PRESIDING







 Liberty Finance, Inc. ("Liberty") appeals from the trial-court judgment declaring
the rights of the parties under various documents associated with a loan transaction. The court
declared that an "equity participation" interest was an element of a lien against a building owned
by appellees and had been discharged upon the satisfaction of the underlying debt. We will affirm.


The Controversy



 In June 1983, appellee Arlene Hengst and her husband Lawrence W. Hengst
("borrowers") borrowed $280,000.00 from Government Personnel Mutual Life Insurance
Company ("GPM") to purchase the Becket Building. (1) The loan was evidenced by a promissory
note, secured by a first lien on the Becket Building, as evidenced by a deed of trust.

 By 1987, borrowers were unable to keep up with the monthly note payments and
negotiated a one-year moratorium on interest payments. The interest otherwise due during the
moratorium was wrapped into principal. After the moratorium expired, borrowers' financial
difficulties continued. The transaction was modified to waive certain past due interest and reduce
the overall interest rate. However, by June 1991, the loan was in default and now characterized
as a "problem loan." The transaction was once again restructured. The parties agreed on the
balance due; GPM agreed to reduce the interest rate to 6% for five years, and then 8% for the rest
of the term of the note. The borrower granted the lender, GPM, an interest labeled as a "limited
equity participation" of 25% of the net profits if the building were sold.

 After a series of events involving an unrelated note made by Lawrence Hengst that
resulted in a judgment in Liberty's favor, Lawrence Hengst filed for bankruptcy protection. In
the bankruptcy proceeding, Liberty purchased the outstanding debts and liens against the Beckett
building and all causes of action related thereto from GPM. Liberty then sued on the note in this
cause. Appellees subsequently paid (2) the full amount of principal and interest they claimed was due
under the last amended loan agreement, contending that payment satisfied all of their obligations
to Liberty. Liberty continued the litigation, contending that it was owed more money on the loan
principal and that the equity participation interest had not been extinguished and would still be due
on any sale of the building. In a bifurcated trial, the jury answered that the amount due under the
loan had been paid; answering "yes" to an accord and satisfaction issue. The judge then rendered
a declaratory judgment that the equity participation was "in the nature of" a lien and accordingly
expired upon the satisfaction of the debt.

 Liberty brings two points of error on appeal, contending that the district court erred
in: (1) rendering a declaratory judgment that the limited equity participation was a lien, and erred
further in declaring that the equity participation terminated upon satisfaction of the debt; and (2)
failing to declare that the equity participation in the form of a net profits interest was payable upon
the first sale of the building and would not be reduced if any junior indebtedness was created
subsequent in time to the equity participation. The parties agree that the core issue presented is
the nature of the limited "equity participation": was it part of the loan transaction such that
payment of the underlying debt discharged all obligations, thus extinguishing the "equity
participation," or did this interest represent an investment by the lender that created an obligation
apart from repaying the principal and interest due on the loan?

 The parties agree on the applicable standard of review. Liberty asserts that the
documents surrounding the transaction establish its rights "as a matter of law." In reviewing this
type of challenge, the appellate court first examines the record for competent evidence that
supports the judgment, while ignoring all evidence to the contrary. If there is no competent
evidence to support the judgment, the reviewing court must then examine the entire record to
determine if the contrary proposition is established as a matter of law. See Holley v. Watts, 629
S.W.2d 694, 696-97 (Tex. 1982). (3)


The Nature of the Equity Participation



 Liberty contends that the equity participation was an investment in the building and
represented an obligation in addition to, and separate from, appellees' obligation to repay the loan
principal and interest secured by the Beckett building. Appellees contend that the equity
participation was, in essence, an amendment to the contract creating the original lien.


Construction of the Contract


 If possible, the trial court must determine the legal effect of the contract from the
four corners of the document. See City of Midland v. Waller, 430 S.W.2d 473 (Tex. 1968). This
is done by considering the entire agreement and harmonizing all provisions, if possible, to
determine a definite meaning. See Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983); Smart v.
Tower Land & Inves. Co., 597 S.W.2d 333, 337 (Tex. 1980). No one phrase, sentence or section
of the contract should be isolated from its setting and considered apart from the other provisions. 
See State Farm Life Ins. Co. v. Beaston, 907 S.W.2d 430, 433 (Tex. 1995); Guardian Trust Co.
v. Bauereisen, 121 S.W.2d 579, 583 (Tex. 1938). Every provision of a contract will be presumed
to have been incorporated for a purpose and shall be considered when arriving at an understanding
of the whole. See General Ins. Corp. v. Laney, 224 S.W.2d 746, 751 (Tex. Civ. App.--Fort
Worth 1949, no writ). The intention of the parties is to be gathered from the instrument as a
whole and not from isolated parts. See Ervay, Inc. v. Wood, 373 S.W.2d 380, 384 (Tex. Civ.
App.--Dallas 1963, writ ref'd n.r.e.). Ultimately, the court's concern is to ascertain and give
effect to the true intentions of the parties as expressed in the written instrument. Lenape
Resources Corp. v. Tennessee Gas Pipeline Co., 925 S.W.2d 565, 574 (Tex. 1996); R & P
Enterps. v. LaGuarta, Gavrel & Kirk, Inc., 596 S.W.2d 517, 518-19 (Tex. 1980).

 The equity participation interest is contained in the "Further Amendment, Renewal
and Confirmation of Real Estate Note, Liens and Assignment of Amounts Payable Under Lease
Agreement." The agreement states it amends and confirms the debts and liens created in the prior
agreement "as valid and subsisting until said indebtedness and note as so renewed and rearranged
have been fully paid, . . ." The "equity participation" interest is created with the following
language:


As part of the consideration for the agreement by Government Personnel Mutual
Life Insurance Company to this forgiveness of interest and further amendment of
said note, it is agreed that upon the sale of the above described premises, or any
part thereof, Government Personnel Mutual Life Insurance Company (which term
includes any successor holder of said note) shall receive Twenty Five percent
(25%) of the net sale price of said property or any part thereof. "Net sale price"
means the gross sale price, less (1) all necessary, reasonable and customary closing
costs of such sale which are chargeable to seller, and (2) the sum at the time of the
closing of the sale, of the principal and interest due on said note at that time. 
Provided further the amounts received by Government Personnel Mutual Life
Insurance Company from such sale proceeds pursuant to this participation
agreement, when added to all other amounts received as interest by Government
Personnel Mutual Life Insurance Company during the term of the note, including
all amendments, renewals and extensions, to that time, as spread back over the
period for which the loan has been outstanding, shall not exceed the maximum
interest allowable, under the applicable law pertaining to usury.



(Emphasis added.)

 Liberty argues that the equity participation could not have been intended to be part
of the lien because GPM already had a lien against the building at the time of the creation of the
equity participation and thus was gaining nothing in return for its further reduction in the interest
charged. (4) Liberty argues that the term "net sale price" means that the equity participation was not
a part of the mortgage but was in addition to the amount due under the mortgage payoff because
the net sale price was defined to exclude the principal and interest due under the note. (Of course,
the principal and interest due under the contract that created the 25% interest, the final amended
agreement, was significantly less than the principal and interest due under the original agreement.)


Liberty's Analogy to Usury Cases


 Liberty contends that the closest cases supporting its contention that the equity
participation was an investment, rather than part of the lien, are found in usury cases determining
whether a transaction was truly an investment or an attempt to collect usurious interest on a loan. 
We think these cases are illuminating because of the explicit tie between the equity participation
created in those documents and the cap on the equity participation in this case tied to the maximum
non-usurious interest that would have been allowable under the original terms of the loan.

 Liberty contends that Korth v. Tumlinson, 73 S.W.2d 1048 (Tex. Civ. App.--San
Antonio 1934, no writ), supports its theory that the parties intended two transactions: a real estate
lien and an investment in the building. In Tumlinson, Mrs. Tumlinson owed Millinger $3,863.15. 
She entered into a contract with Korth in which Korth agreed to pay the indebtedness due
Millinger, and she contracted to pay Korth ten percent on the amount advanced and one-half, or
in the alternative, one-third of the net proceeds if the land should sell. Id. at 1048-49. After
selling the land, Tumlinson sued, claiming that the amount realized by Korth was usurious. Id.

 The court first considered that for a contract to create usurious interests, the terms
of such a contract must show an understanding that the principal would be absolutely repayable. 
The contract at issue failed to state that Tumlinson was to repay Korth the amount of money
advanced by him. Id. at 1049. The contract did not show that Korth was to be paid either
principal or interest if the land was not sold. Rather, if the land was not sold Korth would receive
nothing. Id. Because the contract did not provide for the absolute repayment of the sums of
money advanced, it created a joint venture, in which both parties pooled their resources with the
hope of making a profit. Id. at 1050.

 In the present case, the borrowers had an absolute obligation to repay the principal
and interest. They were obligated to repay the loan irrespective of whether they sold the building. 
Contrary to Liberty's position, Tumlinson supports a finding that the repayment of the principal
and interest was borrowers' only obligation. See also Bray v. McNeely, 682 S.W.2d 615 (Tex.
App.--Houston [1st Dist.] 1984, no writ) (lack of absolute obligation to repay amount advanced
rendered transaction sale of land, not loan).

 Liberty also states that Catalina v. Blasdel, 881 S.W.2d 295 (Tex. 1994), gives the
Texas Supreme Court's best examination of the subject. In Catalina, either Catalina or Blasdel
could purchase used cars for Blasdel's inventory and pay for the cars by envelope drafts drawn
on Catalina's bank account. The agreement set a formula for repayment based in part on a
percentage of the sales price and in part on the length of time the cars remained unsold, but was
silent concerning whether there was an absolute obligation on Blasdel's part to repay the purchase
price. Id. at 296. Blasdel terminated the agreement after four months and sued Catalina for
usury. In considering whether the transaction was in fact a loan disguised as a device to evade the
usury laws, the court looked to whether there was an absolute obligation to repay the principal or
whether repayment was based on a contingency. Id. at 296-97. Whether repayment was based
on a contingency is important in determining whether a transaction is a loan or an investment in
the business. Id. at 297. The court found the fact that repayment was contingent, combined with
the fact that both parties could buy cars for the lot, showed that the parties contemplated a type
of joint undertaking in which Catalina provided the capital. The court held the transaction not
usurious. Id.

 There are several important distinctions between the Catalina case and this case in
looking to find indicia of an investment, rather than a loan. In Catalina, the party furnishing the
capital had the authority to, and actually did, make purchases for resale by the business. Further,
the agreement in Catalina was silent with regard to Blasdel's obligations to repay the principal. 
In the current case, the agreement contained an absolute obligation to pay the principal and interest
or risk foreclosure of the building. GPM did not participate in running the business (for example,
the lender had no authority to act as a leasing agent for the building); and in fact, it is undisputed
that GPM did not desire to foreclose on the building. The transaction documentation in the instant
case went to great lengths to tie the amount realizable upon the sale, if any, to the maximum non-usurious interest that would have been possible under the terms of the original loan agreement.

 We understand Liberty's argument to be: if the equity participation, the 25% of
net sale price, might never be paid because the mortgage had been paid off, before any sale, at a
lower amount than under the original terms, was not the lender getting a mere illusion in return
for renegotiating the terms; i.e., to interpret the contract as creating a lien leads to an absurd
result. However, the result is not absurd if the parties did not anticipate the possibility that the
mortgage might be paid off other than through a sale of the building. Given that the pay-off was
the result of an inheritance, this is not an unreasonable surmise and does not contradict the
language used. If the building sold for more than the principal and interest due under the modified
note, the lender stood to regain interest otherwise lost if the building sold for the amount due or
less than the amount due. Furthermore, GPM saved the transaction costs of foreclosure and
disposition of the Becket Building.

 There is no evidence that the transaction as originally entered was other than 
borrowers obtaining money from a lender in order to buy a building, with the building serving as
security for repayment. There is no evidence that at the time of renegotiation and restructuring
the lender was entering into any kind of joint venture; for example, the lender did not advance any
further capital. This interpretation is consistent with the language in the amended contract tying
the amount of the equity participation to the maximum non-usurious interest possible under the
original terms of the loan. As pointed out by appellees, the transactions were all recorded in a
manner consistent with the creation of a lien. We conclude that the trial court's interpretation of
the documents as furthering a secured lien on the building was correct and overrule point of error
one.


Point of Error Two



 In point of error two, Liberty contends that the trial court erred in failing to declare
that the equity participation was payable upon the first sale of the building and would not be
reduced if any junior indebtedness was created. In overruling Liberty's first point, we concluded
that the trial judge correctly declared that the equity participation was part of the lien and was
extinguished upon satisfaction of the underlying debt. The jury found that the underlying debt had
been satisfied. Accordingly, the equity participation interest was extinguished, and we need not
consider point of error two.

 We affirm the trial-court judgment.



 

 Mack Kidd, Justice

Before Chief Justice Aboussie, Justices Jones and Kidd

Affirmed

Filed: April 1, 1999

Do Not Publish
1. Lawrence W. Hengst was not a party to the suit resulting in this appeal. In a transaction that
does not affect the outcome of the cause, the Becket Building was conveyed to appellee L & A
Properties Limited Partnership, owned by Hengst family trusts.
2. Appellee Arlene Hengst had inherited Pepsi stock from her mother and other assets from her
father. These assets had been placed in family trusts as part of an estate planning process. By the
time of the litigation, the Pepsi stock had appreciated, and was used as collateral to secure a loan
to repay the Becket Building loan.
3. The parties' briefs are not very clear about whether the contract was ambiguous. Liberty
complains of parol evidence, but appellee does not rely on that evidence in arguing for its
construction of the contract.
4. It is undisputed that GPM did not want possession of the building.



urnishing the
capital had the authority to, and actually did, make purchases for resale by the business. Further,
the agreement in Catalina was silent with regard to Blasdel's obligations to repay the principal. 
In the current case, the agreement contained an absolute obligation to pay the principal and interest
or risk foreclosure of the building. GPM did not participate in running the business (for example,
the lender had no authority to act as a leasing agent for the building); and in fact, it is undisputed
that GPM did not desire to foreclose on the building. The transaction documentation in the instant
case went to great lengths to tie the amount realizable upon the sale, if any, to the maximum non-usurious interest that would have been possible under the terms of the original loan agreement.

 We understand Liberty's argument to be: if the equity participation, the 25% of
net sale price, might never be paid because the mortgage had been paid off, before any sale, at a
lower amount than under the original terms, was not the lender getting a mere illusion in return
for renegotiating the terms; i.e., to interpret the contract as creating a lien leads to an absurd
result. However, the result is not absurd if the parties did not anticipate the possibility that the
mortgage might be paid off other than through a sale of the building. Given that the pay-off was
the result of an inheritance, this is not an unreasonable surmise and does not contradict the
language used. If the building sold for more than the principal and interest due under the modified
note, the lender stood to regain interest otherwise lost if the building sold for the amount due or
less than the amount due. Furthermore, GPM saved the transaction costs of foreclosure and
disposition of the Becket Building.

 There is no evidence that the transaction as originally entered was other than 
borrowers obtaining money from a lender in order to buy a building, with the building serving as
security for repayment. There is no evidence that at the time of renegotiation and restructuring
the lender was entering into any kind of joint venture; for example, the lender did not advance any
further capital. This interpretation is consistent with the language in the amended contract tying
the amount of the equity participation to the maximum non-usurious interest possible under the
original terms of the loan. As pointed out by appellees, the transactions were all recorded in a
manner consistent with the creation of a lien. We conclude that the trial court's interpretation of
the documents as furthering a secured lien on the building was correct and overrule point of error
one.


Point of Error Two



 In point of error two, Liberty contends that the trial court erred in failing to declare
that the equity participation was payable upon the first sale of the building and would not be
reduced if any junior indebtedness was created. In overruling Liberty's first point, we concluded
that the trial judge correctly declared that the equity participation was part of the lien and was
extinguished upon satisfaction of the underlying debt. The jury found that the underlying debt had
been satisfied. Accordingly, the equity participation interest was extinguished, and we need not
consider point of error two.

 We affirm the trial-court judgment.



 

 Mack Kidd, Justice

Before Chief Justice Aboussie, Justices Jones and Kidd

Affirmed

Filed: April 1, 1999

Do Not Publish
1. Lawrence W. Hengst was not a party to the suit resulting in this appeal. In a transaction that
does not affect the outcome of the cause, the Becket Building was conveyed to appellee L & A
Properties Limited Partnership, owned by Hengst family trusts.
2. Appellee Arlene Hengst had inherited Pepsi stock from her mother and other assets from her
father. These assets had been placed in family trusts as part of an estate planning process. By the
time of the litigation, the Pepsi stock